## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | * | |
| | * | CHAPTER 9 |
| | * | |
| CITY OF HARRISBURG, PA | * | CASE NO. 1:11-bk-06938MDF |
| (By the City Council) | * | |
| Debtor | * | |
| | * | |

## OPINION

The City of Harrisburg, by its City Council, filed a petition for relief under Chapter 9 of the Bankruptcy Code. The Commonwealth of Pennsylvania (the "Commonwealth"), the County of Dauphin ("Dauphin County") and the City of Harrisburg by the Honorable Mayor Linda D. Thompson (the "Mayor") and other creditors and interested parties objected to the filing.[1] For the reasons set forth below, the Objections were sustained at the hearing held on November 23, 2011, and the petition was dismissed.[2]

### I. Procedural History

The City Council for the City of Harrisburg ("City Council" or "Petitioner") filed its petition on October 11, 2011. A Statement of Qualifications under Section 109(c) was filed by Mark D. Schwartz, who had been retained as counsel by the Petitioner. Pursuant to 11 U.S.C. § 921(b), the Honorable Theodore A. McKee, Chief Judge, United States Court of Appeals for the Third Circuit, designated the undersigned to preside over the within case. On October 13, 2011,

---

[1]Other parties filing objections to the petition or joining in the objections of other entities are: Covanta Harrisburg, Inc., Ambac Assurance Corporation, National Public Finance Guarantee Corporation, American Federation of State, County and Municipal Employees (District Council 90), Fraternal Order of Police (Capital Lodge No. 12), TD Bank, N.A., Manufacturers and Traders Trust Company, Assured Guaranty Municipal Corp., and Syncora Guarantee, Inc.

[2]The Court has jurisdiction over this case pursuant to 28 U.S.C. §§ 157 and 1334(a). This is a core proceeding under 28 U.S.C. § 157(b)(1).

the Mayor filed an Emergency Motion to Request Status Conference, which was granted by the Court, and a conference was set for October 17, 2011. On October 14, the Commonwealth filed an Objection to the petition asserting that the City of Harrisburg was not specifically authorized to be a debtor as required by 11 U.S.C. § 109(c)(2). On the same date, the Court entered an order requiring publication of a notice of the commencement of the case as mandated by 11 U.S.C. § 923 and setting a deadline of November 21, 2011 for filing objections to the petition.

At the status conference on October 17, the Court declined to immediately dismiss the petition in the absence of notice to all parties that the Commonwealth's objection to the filing would be heard on that date. At that time no other party had filed an objection to the petition, although both the Mayor and Dauphin County represented to the Court that they also would be requesting dismissal of the petition. The Court stated that it would address the preliminary legal issue of whether City Council was specifically authorized by the Commonwealth to file a bankruptcy petition as required by 11 U.S.C. § 109(c)(2) and whether City Council was authorized under the Third Class City Code and other relevant law to file on behalf of the City.

On October 19, 2011, the Court entered an order modifying the deadlines for filing objections to the petition. The October 19 Order also vacated provisions of the October 14 Order directing advertisement of the commencement of the case. A hearing on objections to the petition was scheduled for November 23, 2011, and a briefing schedule was issued. At the hearing the parties stipulated to the admission of all exhibits submitted by the parties with their briefs. After hearing argument from the Objectors and from City Council and attorney Neil

Grover on behalf of Debt Watch Harrisburg[3] in support of the petition, the Court rendered an oral opinion and entered an Order dismissing the case.

**Facts**

Two threshold issues were presented by the filing of the Chapter 9 petition: (1) whether the City Council, without the concurrence of the Mayor or without review by the City Solicitor, had the authority to commence a bankruptcy case on behalf of the City of Harrisburg and (2) whether the City of Harrisburg was specifically authorized under state law to be a debtor under the Bankruptcy Code. The facts relevant to these discrete issues are not in dispute.

On October 1, 2010, the Mayor filed a Request for Municipal Financial Distress with the Department of Community and Economic Development, Commonwealth of Pennsylvania ("DCED"). On December 15, 2010, the Secretary of DCED made a finding of "municipal financial distress" under the Municipalities Financial Recovery Act, Act of 1987, P.S. 246, No. 24, 53 P.S. § 11701.101 et seq. (hereinafter "Act 47").  Under the provisions of Act 47, a coordinator was appointed by the Secretary of DCED to prepare a financial recovery plan to address the City's financial problems.[4] The coordinator presented the Act 47 recovery plan on

---

[3]Debt Watch Harrisburg is a taxpayer advocacy organization founded by attorney Neil Grover. The Mayor, while not objecting to pleadings filed by Mr. Grover on behalf of Debt Watch Harrisburg, reserved her right to contest the standing of both Mr. Grover and the organization in future proceedings.

[4]In the Findings of Fact and Conclusions of Law issued in support of the determination that Harrisburg was a distressed city, the Secretary of DCED stated that DCED was not empowered to direct the City to file for bankruptcy and that any decision to file for Chapter 9 relief "rests exclusively with the City. 53 P.S. § 11701.261." The Secretary further noted that:

> Section 261 of Act 47 provides authority for the City to file for Chapter 9 relief if any one of the five statutory conditions set out in Section 261 is met. Specifically, the City is authorized to file for federal bankruptcy protection: 1) if the

3

June 13, 2011, but on July 19, 2011, City Council voted not to adopt the plan. Under the terms of Act 47, the Mayor then prepared and submitted her own a financial recovery plan, but it also was rejected by City Council.

In the meantime, on June 30, 2011, the last day of the legislative year, legislation was signed by the Governor, which made various amendments to the state Fiscal Code. Act of April 9, 1929, P.S. 343, No. 176, as amended by Act 26 of June 30, 2011, No. 907 (hereinafter "Act 26"), 72 P.S. § 1601-D.1(A). The sixty-one page act includes subjects as diverse as the funding of agricultural research and extension services, amendments to the creation of Neighborhood Improvement Zones, caps on certain tax credits for employers within a Keystone Special Development Zone, extension of the authority of the State Workers' Insurance Board to invest in equities, removal of a cap on the amount of proceeds from the sale of data that the Pennsylvania Health Care Cost Containment Council may retain, retention and disposition of funds in the Tobacco Settlement Fund, and direction to the Department of Agriculture to conduct an annual audit of funds distributed from the Pennsylvania Race Horse Development Fund.[5] The provision

coordinator recommends such action; 2) if there is imminent jeopardy of creditor action which will negatively affect the City's ability to provide health and safety services; 3) if creditors reject a proposed recovery plan; 4) if federal bankruptcy relief can potentially solve the City's financial distress; or 5) if the City fails to adopt or carry out a financial recovery plan. 53 P.S. § 11701.261.

[5]The "short title" of Senate Bill No. 907, which became Act 26 of 2011, is:

An Act amending the act of April 9, 1929 (P.L. 343, No.176), known as The Fiscal Code, providing for time for filing returns for certain sales and use taxpayers; establishing a restricted account within the Agricultural College Land Scrip Fund; in borrowing for capital facilities, further providing for definitions, for Neighborhood Improvement Zone Fund, for Keystone Opportunity Zone and for duration and providing for Commonwealth pledges and for confidentiality, *providing for financially distressed municipalities* and for Keystone Special

4

relevant to the issues before the Court, Section 1601-D.1 of Act 26, restricts the ability of a financially distressed city of the third class, as defined in Act 47, to file a petition for relief under Chapter 9 of the Bankruptcy Code. As set forth in the section's scope at subsection (A) of § 1601-D.1, this restriction "applies to a city of the third class which is determined to be financially distressed under Section 203 of [Act 47]." 72 P.S. § 1601-D.1(A). Subsection (B) of § 1601-D.1, entitled "Limitation on Bankruptcy," provides that:

> [n]otwithstanding any other provision of law, including Section 261 of [Act 47], no distressed city may file a petition for relief under 11 U.S.C. Ch. 9 (relating to adjustment of debts of a municipality) or any other federal bankruptcy law, and no government agency may authorize the distressed city to become a debtor under 11 U.S.C. Ch. 9 or any other federal bankruptcy law.

72 P.S. § 1601-D.1(B) (2011). Act 26 further provides that if a city files for bankruptcy, "all Commonwealth funding to the city shall be suspended." 72 P.S. § 1601-D.1(C). The ban on bankruptcy filings by a financially distressed third class city expires on July 1, 2012. 72 P.S. § 1601-D.1(D).

---

Development Zones; in education tax credits, making an editorial change and providing for Department of Revenue and for Department of Community and Economic Development; in special funds, further providing for funding and reviving and further providing for investments; providing for 2011-2012 budget implementation and restrictions; in general budget implementation, further providing for executive offices and for the Auditor General, providing for Pennsylvania Infrastructure Investment Authority Accounts, further providing for the Pennsylvania Higher Education Assistance Agency, repealing provisions related to the Legislative Department, providing for the Catastrophic Loss Benefits Continuation Fund and further providing for the State Gaming Fund; in 2010-2011 budget implementation, further providing for the Department of Education; providing for audits; and making related repeals.

The provision barring a third class city from filing a bankruptcy petition is set forth in italics.

5

On October 11, 2011, a majority of the members of City Council adopted a Resolution[6] authorizing the City of Harrisburg to file "a municipal debt adjustment action" under the Bankruptcy Code. In the Resolution, City Council stated that Harrisburg was designated as a distressed city under Act 47 on December 15, 2010. It further stated that City Council is the "governing body" as defined in Act 47 and, therefore, is empowered to file a bankruptcy petition on the City's behalf. *See* 53 P.S. § 11701.261(b). City Council also stated in the Resolution that the City of Harrisburg was qualified to be a debtor under Chapter 9 because the City was in "imminent jeopardy of an action by a creditor, claimant or supplier of goods or services which is likely to substantially interrupt or restrict the continued ability of [the municipality] to provide health or safety services to its citizens"; "[o]ne or more creditors of the municipality have rejected the proposed or adopted plan, and efforts to negotiate a resolution of their claims have been unsuccessful for a ten-day period"; [a] condition substantially affecting the municipality's financial distress is potentially solvable only utilizing a remedy exclusively available . . . through [municipal bankruptcy]"; and "[a] majority of the current . . .governing body of a municipality determined to be financially distressed has failed to adopt a plan or to carry out the recommendations of the Act 47 coordinator."[7] Resolution p. 2-3.

---

[6]City of Harrisburg, October 11, 2011, *A Resolution of the City Council of City of Harrisburg, PA authorizing filing of a Petition under Chapter 9 of the United States Bankruptcy Code* (hereinafter "Resolution").

[7]The Court does not suggest that the parties agree that all four conditions cited by City Council were present, but simply that City Council's Resolution asserted that they existed.

6

Objections to the petition were filed by the Commonwealth, the Mayor, Dauphin County, and nine other interested parties.[8] Briefs were filed, argument was heard on November 23, 2011, and an oral decision was rendered. This Opinion is issued in support of the Order dismissing the case.

### III. Discussion

Objectants assert that the City of Harrisburg is not eligible to be a debtor under Chapter 9 of the Bankruptcy Code as provided in 11 U.S.C. § 109(c). The Mayor argues that City Counsel lacked the authority to retain separate counsel to file the petition and that City Council's actions violated the Harrisburg Code.

To be eligible for Chapter 9 relief, a petitioning municipality must meet the five criteria listed in § 109(c). The burden of establishing eligibility is on the debtor. *In re Valley Health Sys.*, 383 B.R. 156, 161 (Bankr. C.D. Cal. 2008); *see also In re Barnwell County Hosp.*, ___ B.R. ___, 20011 WL 5117073, *7 (Bankr. D. S.C. October 27, 2011); *In re Pierce County Housing Authority*, 414 B.R. 702, 710 (Bankr. W.D. Wash. 2009); *In re Alleghany-Highlands Economic Development Authority*, 270 B.R. 647, 649 (Bankr. W.D. Va. 2001). If the petitioner is unable to demonstrate that all elements have been satisfied, the petition must be dismissed. *In re New York City Off-Track Betting Corp.*, 427 B.R. 256, 264 (Bankr. S.D.N.Y. 2010) (citing *Int'l Ass'n of Firefighters, Local 1186 v. City of Vallejo (In re City of Vallejo)*, 408 B.R. 280, 289 (B.A.P. 9th Cir. 2009); *In re Valley Health Sys.*, 383 B.R. at 160. However, the criteria are to be construed broadly to enable municipalities to obtain the relief available under federal law. *Hamilton Creek Metro. Dist. v. Bondholders Colorado Bondshares (In re Hamilton Creek Metro. Dist.)*, 143 F.3d

---

[8]*See* footnote 1, *infra*.

7

1381, 1384 (10th Cir. 1998) ("To be eligible for chapter 9 relief, a petitioner must meet several criteria, which are to be construed broadly to provide access to relief in furtherance of the Code's underlying policies."); *In re City of Vallejo*, 408 B.R. at 289 ("We construe broadly § 109(c)'s eligibility requirements . . . .") (citing *In re Valley Health Sys.*, 383 B.R. at 161) (other citations omitted)); *In re New York City Off-Track Betting Corp.*, 427 B.R. at 265 ("Congress has clearly intended to expand 'the applicability of chapter IX as much as possible.'") (citing H.R. Rep. No. 94–686, at 19–20, 94th Cong. 2nd Sess. (1975) and S. Rep. No. 94–458, at 13, 94th Cong. 1st Sess. (1975)).

At this point in this proceeding, only one of the five prerequisites was considered by the Court – whether the City of Harrisburg was specifically authorized to file a Chapter 9 petition.

    A.    *Requirement that a municipality be "specifically authorized" to file a petition*

Under § 109(c)(2) of the Bankruptcy Code, a municipality may be a Chapter 9 debtor only if it "is specifically authorized, in its capacity as a municipality or by name, to be a debtor under such chapter by State law, or by a governmental officer or organization empowered by State law to authorize such entity to be a debtor under such chapter . . . ." 11 U.S.C. § 109(c)(2). Objectants assert that the City of Harrisburg cannot be a debtor under Chapter 9 because it does not have specific authorization from the Commonwealth to file for bankruptcy relief. Not only has the Commonwealth *not authorized* the City to file, Objectants assert, municipalities classified as "cities of the third class" that have been determined to be financially distressed have been specifically *prohibited* from filing for relief.

The allegation that the City has sought bankruptcy relief in defiance of this statutory bar raises important concerns of federalism and respect for the power of states to manage their

8

internal affairs. Primary among these concerns is the Tenth Amendment to the U.S. Constitution, which provides that "powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the People." U.S. Const. amend. X.  Although Congress has the sole power to establish "uniform Laws on the subject of Bankruptcies throughout the United States" (U.S. Const. art. I, § 8), where federal bankruptcy law intersects with the rights of states to regulate the activities of political subdivisions created by the state, principles of dual sovereignty as defined by the Tenth Amendment must be considered. Congress has made bankruptcy available to municipalities, but states retain their concomitant rights to limit access by their political subdivisions to bankruptcy relief.[9] "In our democracy, people look to and are served by their elected representatives in national, state, and local government, but our federal system only recognizes the dual sovereignty of the United States and the states." *In re City of Bridgeport*, 128 B.R. 688, 691 (Bankr. D. Conn. 1991).  Accordingly, federal law does not allow municipalities, which are subdivisions or instrumentalities of a state, to file for bankruptcy without state authorization. *Id.* at 692 (Chapter 9 does not grant a municipality rights and powers independent of the state.)

Considering the limited number of Chapter 9 cases, many courts have wrestled with the issue of what constitutes state authorization to file a bankruptcy petition. Prior to the 1994 revisions to the Bankruptcy Code, § 109(c)(2) provided that a municipality had to be "generally

---

[9]States have taken a variety of approaches to municipal bankruptcy. Some states provide general authorization without conditions. Other states, like Pennsylvania, provide state mechanisms for resolving problems facing financially stressed municipalities in place of or in addition to bankruptcy relief. At least one state, Georgia, prohibits municipal bankruptcy filings altogether. Several states have no statutory provisions on municipal bankruptcy. See Frederick Tung, *After Orange County: Reforming California Municipal Bankruptcy Law*, 53 Hastings L. J. 885, 886 (2002).

9

authorized" by state law to be a debtor under Chapter 9. Because the term "generally" was interpreted broadly by some courts and narrowly by others, Congress amended § 109(c)(2) to clarify that a state must provide "specific" authorization to comply with Tenth Amendment constraints. The current version of § 109(c)(2) requires specific state authorization for a municipality to file a bankruptcy petition either through state statute or by a governmental officer or organization empowered to authorize a Chapter 9 filing. As one bankruptcy court has observed, states "act as gatekeepers to their municipalities' access to relief under the Bankruptcy Code." *In re City of Vallejo*, 403 B.R. 72, 76 (Bankr. E.D. Cal. 2009), aff'd *Int'l Brotherhood of Electrical Workers, Local 2376 v. City of Vallejo, Cal. (In re City of Vallejo)*, 432 B.R. 262 (E.D. Cal. 2010). Therefore, when the authority to file under state law is questioned, bankruptcy courts exercise jurisdiction carefully, "in light of the interplay between Congress' bankruptcy power and the limitations on federal power under the Tenth Amendment." *In re Cottonwood Water and Sanitation Dist.*, 138 B.R. 973, 979 (Bankr. D. Colo. 1992).

      B.    *Authorization to file Chapter 9 under state law prior to June 28, 2011*

When the City of Harrisburg entered the Act 47 program in December 2010, a municipality was authorized under Pennsylvania law to file a "municipal debt adjustment action" under the Bankruptcy Code if one of five conditions existed . The first condition was when the plan coordinator under Act 47 recommends bankruptcy relief. 53 P.S. § 11701.261(a)(1). The second condition justifying the filing of a bankruptcy petition was when "[i]mminent jeopardy" exists that "an action by a creditor, claimant or supplier of goods or services" is "likely to substantially interrupt or restrict the continued ability of the municipality to provide health or safety services to its citizens." 53 P.S. § 11701.261(a)(2). Under the third condition, if a

10

municipality proposed or adopted an Act 47 plan that was rejected by one or more creditors and efforts to negotiate a settlement of creditor claims were unsuccessful, the municipality was authorized to file for bankruptcy relief. 53 P.S. § 11701.261(a)(3). The fourth condition authorizing a municipality to file a petition was when Chapter 9 afforded a remedy not otherwise available for "[a] condition substantially affecting the municipality's financial distress." 53 P.S. § 11701.261(a)(4). The fifth condition justifying the filing of a bankruptcy petition was when "[a] majority of the current . . . governing body of a municipality determined to be financially distressed has failed to adopt a plan or to carry out the recommendations of the coordinator. . . ." 53 P.S. § 11701.261(a)(5).

Act 47 provides that the authority to file a bankruptcy petition "may be exercised only upon the vote by a majority of the municipality's governing body." 53 P.S. § 11701.261(b). For a city under Act 47, "governing body" is defined as a city's council. 53 P.S. § 11701.103. City Council asserts that the City of Harrisburg meets several of the conditions set forth in 53 P.S. § 11701.261(a). Although the parties may dispute whether the City was eligible to file under all the provisions cited by City Council, it cannot reasonably be contested that City Council failed to adopt a plan under Act 47. Therefore, in the absence of the bar to filing imposed by Act 26, on October 11, 2011, the City of Harrisburg had met at least one of the required conditions and would have been specifically authorized to file a petition under Chapter 9. The issue then becomes, did the passage of Act 26 on June 30, 2011 eliminate the ability of the City of Harrisburg to file for bankruptcy relief on October 12, 2011.

C.      *Constitutional challenges to Act 26*

Act 26 pointedly states that a third class city admitted to the Act 47 program may not file a bankruptcy petition.  72 P.S. § 1601-D.1(B). City Council[10] argues that this legislation was ineffective in barring the City's bankruptcy filing because it conflicts with provisions of the U.S. Constitution and the Pennsylvania Constitution.

1.      *The U.S. Constitution*

City Council first suggests that Act 26 violates the Supremacy Clause of the U.S. Constitution as well as the Fourteenth Amendment to the U.S. Constitution. Both assertions are easily dismissed. Neither provision invalidates the actions taken by the Commonwealth to regulate the use of the bankruptcy process by distressed third class cities. The citation to the Supremacy Clause does not support City Council's argument because, as noted above, in regard to admission into the bankruptcy process, §109(c)(2) recognizes that a state serves as a municipality's gatekeeper into Chapter 9. It is only after a state specifically authorizes a municipality to file a bankruptcy petition and an order for relief is entered under 11 U.S.C. § 921(d) that the Supremacy Clause would become relevant to matters before this Court. Even after an order for relief is granted, states maintain significant control over their political subdivisions. This position is set forth bluntly in § 903 of the Bankruptcy Code, which states that Chapter 9 does not "limit or impair the power of a State to control, by legislation or otherwise, a

_____

[10]Although this Opinion refers to the City Council's positions in support of the petition, similar arguments were presented by Mr. Grover on behalf of Debt Watch Harrisburg. For ease of reference, the Court will refer only to City Council, but Mr. Grover's arguments were considered as well.

Case 1:11-bk-06938-MDF    Doc 144    Filed 12/05/11    Entered 12/05/11 14:08:52    Desc
Main Document      Page 12 of 30

municipality . . . in the exercise of the political or governmental powers of such municipality. . . ." 11 U.S.C. § 903.

Likewise, City Council's reliance on the Fourteenth Amendment is unavailing. "[T]he city being a municipal corporation and the creature of the state Legislature, does not stand in a position to claim the benefit of the constitutional provision in question, since its charter can be amended, changed, or even abolished at the will of the Legislature." *City of New Orleans v. New Orleans Water Works Co.*, 142 U.S. 79, 89 (1891); *see also City of Newark v. New Jersey*, 262 U.S. 192, 196 (1923) ("The City cannot invoke the protection of the Fourteenth Amendment against the State."); *City of Moore v. Atchinson, Topeka, & Santa Fe Ry. Co.*, 699 F.2d 507, 511-12 (10th Cir. 1983) ("[P]olitical subdivisions of a state lack standing to challenge the validity of a state statute on Fourteenth Amendment grounds.")

> 2.     *The Pennsylvania Constitution*

City Council also asserts that Act 26 violates several provisions under the Pennsylvania Constitution.[11] In reviewing the statute for constitutional infirmities, the Court must keep in mind that a party who challenges the constitutionally of a statute bears a very heavy burden of persuasion. *Pennsylvania Liquor Bd. v. Spa Athletic Club*, 506 Pa. 364, 370, 485 A.2d 732, 735 (1984) *cited in Walsh v. Commonwealth (In re Tykla)*, 353 B.R. 437, 447 (Bankr. W.D. Pa. 2006). It is well established that a law should not be struck down "unless it clearly, palpably and plainly violates the Constitution; all doubts are to be resolved in favor of a finding of

---

[11]City Council's brief makes reference to Article I, Section 2 and Article II, Section 1 of the Pennsylvania Constitution but no particular violation of these provisions is alleged. Accordingly, the Court will assume that neither of these sections are regarded as providing a basis for City Council's constitutional challenge to Act 26.

constitutionality." *Commonwealth v. Mayfield,* 574 Pa. 460, 466, 832 A.2d 418, 421 (2003).

This cautionary ruling applies with particular force to decisions rendered by lower federal courts.

A federal court has limited power to construe a state statute. It's interpretation of state law is "not

binding on the state courts and may be discredited at any time – thus essentially rendering the

federal-court decision advisory and the litigation underlying it meaningless." *Moore v. Sims*, 442

U.S. 415 (1979).

> a. *Article I, Section 17 – retroactive application of law impairing vested rights*

Article I, Section 17 of the Pennsylvania Constitution states: "[n]o *ex post facto* law, nor

any law impairing the obligation of contracts, or making irrevocable any grant of special

privileges or immunities, shall be passed." Pa. Const. Art. 1, § 17. City Council asserts that Act

26 is an unconstitutional *ex post facto* law. According to this argument, the City of Harrisburg,

having previously committed itself to Act 47 distressed city status, obtained a vested right,

enforceable as a contract, to invoke § 261 of Act 47, which authorizes a distressed city to file a

bankruptcy petition. City Council's argument that Act 26 as applied to the City constitutes an *ex*

*post facto* law is misplaced. For almost 100 years, cases interpreting Article I, Section 17 have

held that the term *ex post facto* applies strictly to penal statutes. *See* 16 *West's Pennsylvania*

*Practice*, § 1:12 (2011). "*[E]x post facto*, as used in the Constitution of the United States and of

this State is limited to penal statutes, and may be defined as . . . impos[ing] a punishment for an

act which was not punishable when it was committed, impos[ing] additional punishment or

chang[ing] the rules of evidence by which less or different testimony is sufficient to convict."

14

*Myers v. Lohr*, 72 Pa. Super 472, 475 (1919) (citing *Calder v. Bull*, 3 U.S. 386, 390 (1798)).

Because Act 26 is not a penal statute, City Council's argument on this point must fail.

City Council next argues that Act 47 extends to any city entering the distressed cities program a contractual or vested right to seek bankruptcy protection and that retroactive application of Act 26 is unconstitutional. "A retroactive law is 'one which relates back to and gives a previous transaction a legal effect different from that which it had under the law in effect when it transpired.'" *Sher v. Berks County Bd. of Assessment Appeals*, 940 A.2d 629, 635 (Pa. Commw. 2008) (quoting *R & P Servs., Inc. v. Department of Revenue,* 116 Pa. Commw. Ct. 230, 235, 541 A.2d 432, 434 (1988)). However, "[w]here no vested right or contractual obligation is involved, an act or a regulation is not impermissibly construed retroactively when applied to a condition existing on its effective date, even though the condition results from events which occurred prior to that date." *R & P Servs.,* 116 Pa. Commw. Ct. at 235, 541 A.2d at 635. The Pennsylvania Supreme Court has held that a municipality has no vested right in its corporate powers or even in its very existence. *Commonwealth ex rel. Elkins v. Moir*, 49 A. 351 (Pa. 1901). This principle is a logical corollary to the U.S. Supreme Court's pronouncement in *City of New Orleans* that, as a creature of the state, a city charter can be amended, changed, or even abolished at the will of the state. *City of New Orleans*, 142 U.S. at 89. Accordingly, the City of Harrisburg held no vested right in the availability of bankruptcy relief at the time it entered the Act 47 program, and its challenge to Act 26 on this basis must fail.

      *b.*     *Article III, Section 1 – original purpose rule*

Article III, Section 1 of the Pennsylvania Constitution states: "No law shall be passed except by bill, and no bill shall be so altered or amended, on its passage though either House, as

15

to change its original purpose." Pa. Const. Art. III, § 1. Petitioner asserts that the provision regarding financially distressed municipalities in Act 26 violates this constitutional provision.

Whether a bill has departed from its original purpose is determined by the application of a two-pronged test announced by the Pennsylvania Supreme Court in *Pennsylvanians Against Gambling Expansion Fund, Inc. v. Commonwealth of Pennsylvania*, 583 Pa. 275, 877 A.2d 383 (2005) (hereafter, "*PAGE*"). The reviewing court first must compare the final purpose of the bill to its original purpose and determine whether the original purpose has been altered or amended. Second, the court must consider whether the title and contents of the final bill are deceptive. The legislation must pass both prongs of the test to be found constitutional. *Marcavage v. Rendell*, 936 A.2d 188, 192 (Pa. Commw. Ct. 2007) (citing *PAGE*, 583 Pa. at 317-18, 877 A.2d at 408-9).

The legislation's original purpose must be considered in "reasonably broad terms," acknowledging that the General Assembly should be afforded an opportunity to amend the bill without running afoul of the constitutional prohibition under Article III, Section 1. *PAGE*, 583 Pa. at 318, 877 A.2d at 409. The realities of the legislative process include an expectation that legislation will be transformed as consensus is developed. *Id.* A court is not required to rely on direct statements in the text of the bill, but when discerning its purpose, should "hypothesize, based on the text of the statute, as to the reasonably broad original purpose." *Id.* Finally, a court should be "loathe to substitute [its] judgment for that of the legislative branch under the pretense of determining whether an unconstitutional change in purpose of a piece of legislation has occurred during the course of its enactment." *Id.*

City Council maintains that when Senate Bill 907 was introduced on March 30, 2011, its original purpose was to reauthorize the State Workers' Insurance Board to invest in equity

16

securities and that the final version of the bill was expanded impermissibly beyond this original purpose. The history of Senate Bill 907 provides insight into how the original and final purposes of the bill are related. Senate Bill 907 was first amended on May 23, 2011. Only minor changes were made to the original subject – the investment powers of the State Workers' Insurance Board. After passage in the Senate on May 24, 2011, the bill moved to the House where it underwent significant changes. The House made numerous amendments to the legislation addressing funding and tax issues for a variety of state programs. All of the proposed changes were made to subjects addressed in title 72, the Fiscal Code. The single outlier was a ban on bankruptcy filings by distressed third class cities, a subject that otherwise is addressed under title 53, the Municipalities Code. Senate Bill 907, as amended, was passed by both houses on June 30, 2011, the last day of the legislative session.

In its brief, Dauphin County asserts that the purpose of Senate Bill 907 is the "direction of the fiscal obligations and responsibilities of instrumentalities of the Commonwealth, including municipalities, agencies, and authorities." The County argues that this overarching purpose includes the original purpose of the bill – reauthorization of the investment powers of the State Workers' Insurance Board. Clearly, the topics covered in the final version, which included such diverse subjects as the Agricultural College Land Scrip Fund, Neighborhood Improvement Zones, caps on specific tax credits, and the Tobacco Settlement Fund, to name a few, reaches far beyond the original scope of Senate Bill 907. However, if the modest subject of the original purpose is encompassed within the overall purpose of the final bill, Article III, Section 1 is satisfied. *Id.,* 583 Pa. at 318, 877 A.2d at 409.

17

In *PAGE*, the court observed that the General Assembly may amend and even expand a bill without violating the provisions of Article III, Section 1. *Id.* The original subject of the bill in *PAGE* was the power of the state police to perform criminal background checks for licensees of the State Harness and Horse Racing Commission. The final version of the bill included a variety of provisions related to state regulation of gaming. The court determined that when the original purpose of the bill – empowering the state police to perform background checks – was viewed in the larger context of the final bill, it was able to conclude that the original purpose of the bill was the regulation of gaming. Accordingly, the court held that the amended bill was not altered or amended to change its original purpose. *Id.*, 583 Pa. at 319, 877 A.2d at 409.

When the guidance of *PAGE* is applied to the legislative history of the case at bar, the Court finds that the broad original purpose of Senate Bill 907 was to direct the fiscal obligations of instrumentalities of the Commonwealth, including the provision of penalties for non-compliance. This original purpose was not changed in the Act's final form. Therefore, Act 26 meets the first prong of the original purpose test set out in *PAGE*.

The second prong of the inquiry requires the court to analyze whether, in its final form, the title and contents of the bill were deceptive. *See City of Philadelphia v. Rendell*, 888 A.2d 922, 934 (Pa. Commw. Ct. 2005). The title of the bill states that among various other purposes, Senate Bill 907 is "providing for financially distressed municipalities." The title of a bill is not deceptive if it "placed reasonable persons on notice of the subject of the bill." *Id.* (citing *PAGE* 583 Pa. at 318, 877 A.2d at 409). Although the phrase in the title suggests a benevolent rather than a prohibitory provision, reasonable persons were put on notice that financially distressed municipalities would be effected by the bill. Accordingly, the amendments were within the larger

18

overarching purpose of the legislation and the title and contents of the final version was not deceptive. Therefore, the process by which Senate Bill 907 became law did not violate Article III, Section 1.

c.     *Article III, Section 3 – single subject rule*

City Council also urges the Court to find that Act 26 is unconstitutional because it violates the single subject rule of Article III, Section 3 of the Pennsylvania Constitution. This section provides: "[n]o bill shall be passed containing more than one subject, which shall be clearly expressed in its title, except a general appropriation bill or a bill codifying or compiling the law or a part thereof." Pa. Const. Art. III, § 3. The single subject rule is met "where the provisions added during the legislative process assist in carrying out the bill's main objective or are otherwise 'germane' to the bill's subject as reflected in its title. . . ." *Commonwealth v. Neiman*, 5 A.3d 353, 356 (Pa. Commw. Ct. 2010) (quoting *PAGE*, 583 Pa. at 296, 877 A.2d at 395-96).

As interpreted by the Pennsylvania Supreme Court, the single subject rule serves three purposes. First, the rule limits the ability of the legislature to engage in the practice known as "logrolling," in which a variety of subjects are combined into one bill when they are unable to garner sufficient votes to pass if they were proposed separately. *City of Philadelphia v. Commonwealth of Pennsylvania*, 575 Pa. 542, 574-75, 838 A.2d 566, 586 (2003). Second, the single subject rule is intended to deter the practice of hiding unpopular legislation in a bill that contains provisions that otherwise have the votes to pass. *Id.* Third, the single subject rule encourages more thoughtful consideration of legislation by avoiding the presentation of an expansive array of subjects in one piece of legislation. *Id.*

19

As discussed above, in *PAGE* the Pennsylvania Supreme Court upheld the constitutionality of a bill that when first proposed only addressed the power of the state police to perform criminal background checks for licensees of the State Harness and Horse Racing Commission, but later was amended to include a variety of provisions related to state regulation of gaming. *Id.* In *City of Philadelphia*, however, the court determined that Senate Bill 1100 of 2002, which covered a variety of divergent topics grouped in title 53 of the Pennsylvania Consolidated Statutes, was unconstitutional. Although the subjects addressed in the legislation had some connection to municipalities, the court found they were too broad to constitute a single subject for purposes of Article III, Section 3. The Court described the disparate nature of the subjects included in Senate Bill 1100 as follows:

> It is not readily apparent, for example, that restricting the political activities of police officers has any logical or legislative nexus to authorizing parking authorities to undertake mixed-use development projects; or that imposing a citizenship requirement for board members of business improvement districts relates to transferring authority over Philadelphia's taxis and limousines from the Public Utility Commission to the Philadelphia Parking Authority; or that any of these provisions are pertinent to the repeal of Section 209(k) of the PICA Act or to authorizing municipalities to hold gifts in trust. Respondents state that all such provisions relate to "municipalities," but, as virtually all of local government is a "municipality," we find that proposed subject too broad to qualify for single-subject status under Article III, Section 3.

*City of Philadelphia,* 475 Pa. at 579-80, 838 A.2d at 589. City Council argues that the subjects included in Act 26 are similarly overbroad.

In a case handed down last year, *Commonwealth v. Neiman,* the Pennsylvania Superior Court analyzed recent decisions on Article III, Section 3. The Superior Court first cited *Fumo v. Pennsylvania Public Utility Commission,* 719 A.2d 10 (Pa. Commw. Ct. 1998), in which the Commonwealth Court considered a bill that, when originally proposed, was two pages in length.

20

The original bill amended the Public Utility Code to increase the time that a taxicab could be in operation. When the bill reached the Senate, however, a lengthy amendment proposing to deregulate the generation of electricity was added. Ultimately, the Commonwealth Court decided that the single subject rule was not violated because all of the provisions of the bill affected the regulation of public utilities and the Public Utility Code. *Neiman*, 5 A.3d at 357 (citing *Fumo*, *supra*).

The *Neiman* court contrasted the conclusion in *Fumo* with the Commonwealth Court's decision in *DeWeese v. Weaver,* 824 A.2d 364 (Pa. Commw. Ct. 2003). In *DeWeese*, the Commonwealth Court addressed Article III, Section 3 concerns in the context of Senate Bill 1089 of 2001, which provided for DNA testing of certain offenders and established the testing responsibilities of the state police. However, the proposed legislation also contained provisions amending the law of comparative negligence as to joint and several liability. In this instance, the Commonwealth Court found that the two subjects did not have a proper relation to each other and were not part of the same legislative scheme. The court was unconvinced by the Commonwealth's attempt to create a single subject by lumping these disparate topics under the Judicial Code. *Id.*

In *Neiman*, the constitutionality of Pennsylvania's version of Megan's Law in Senate Bill 92 of 2003 was at issue. The Superior Court upheld the Megan's Law provisions by severing these sections of the bill from unrelated proposed legislation concerning the Deficiency Judgment Act and other matters. Rejecting the Commonwealth's argument that all topics included in the bill pertained to civil remedies and the trial court's holding that they constituted a single subject because all were included in the Judicial Code, the Superior Court found that the bill, as drafted,

21

violated the single subject rule. *Id.* at 359. Provisions in Senate Bill 92 unrelated to Megan's Law were invalidated.

The breadth of the subject addressed in Act 26 is more similar to the subject in *Fumo* than in *DeWeese* or *Neiman*. Although the overarching theme of Act 26 is broad, it is not overly broad. The topics addressed in Act 26 are related to the same main legislative concern – the fiscal obligations of Commonwealth instrumentalities. The provision addressing bankruptcy filings by distressed third class cities is germane to this subject particularly when the penalty provision for non-compliance is considered.[12] In light of the deference this Court must give to the General Assembly, Act 26 satisfies the single subject rule.

> d.      *Article III, Section 32 – special versus general legislation*

City Council asserts that Act 26 is "special legislation" enacted in violation of Article III, Section 32 of the Pennsylvania Constitution. Article III, Section 32 states that "[t]he General Assembly shall pass no local or special law in any case which has been or can be provided for by general law and specifically the General Assembly shall not pass any local or special law: 1.

---

[12]City Council has argued that the inclusion of a penalty provision in Section 1601-D.1 makes this section directory rather than mandatory. Whether the provision in a statute is mandatory or directory is dependent upon the intent of the legislature. When the language of a statute is clear and unambiguous, the construction of the statute may be ascertained from the language chosen by the legislature. Common sense should be used when reading the statute to obtain the result intended. N. Singer and S. Singer, 3 Sutherland Statutory Construction § 57:3 (7th ed.). Where statutory restrictions are stated in negative terms, usually they are found to be mandatory. *Bladen v. City of Philadelphia*, 60 Pa. 464, 1869 WL 7425, *1 (1869) ("Negative words which go to the power or jurisdiction are not construed to be directory."); *In re McQuiston's Adoption*, 238 Pa. 304, 309, 86 A. 205, 206 (1913) ("[W]hen the intent is to make the act mandatory, negative words are employed, since these necessarily exclude the idea of choice or discretion.") Section 1601-D.1 states: "no distressed city may file a petition for relief." Therefore, this section is mandatory, not directory. Whether it is mandatory or directory is of no moment, however, if the law is otherwise constitutional. Unless Act 26 is stricken, the City of Harrisburg was not specifically authorized to file a bankruptcy petition.

22

Regulating the affairs of counties, cities . . . ." Pa. Const. art. III, § 32.[13] City Council argues that

because the General Assembly had Harrisburg in mind when the legislation was drafted, Act 26

violates the prohibition against special legislation.

An act of the General Assembly is not prohibited special legislation if "there is any

rational basis pursuant to which the classification may have been made." *Harristown*

*Development Corp. v. Commonwealth*, 532 Pa. 45, 52, 614 A.2d 1128, 1132 (1992). However,

the distinction between a "general" law and a "special" law is often subtle. The Pennsylvania

Supreme Court has advised that if legislation is directed toward a particular class, it may be

characterized as "general," not "special" legislation. However, the classification must be:

> founded on real distinctions in the subjects classified, and not on artificial or
> irrelevant ones, used for the purpose of evading the constitutional prohibition. If
> the distinctions are genuine, the courts cannot declare the classification void,
> though they may not consider it to be on a sound basis. The test is not wisdom,
> but good faith in the classification.

*Freezer Storage v. Armstrong Cork Co.*, 476 Pa. 270, 275, 382 A.2d 715, 718 (1978) (citations

omitted). The distinction between "special" and "general" legislation is illustrated by two

companion cases addressing the General Assembly's authority to enact legislation addressing the

problem of the City of Harrisburg's troubled public schools.

The Education Empowerment Act, Act 16 of 2000 ("EEA"), 24 P.S. §§ 17-1701-B *et seq*.

was enacted in 2000 and authorized the Secretary of Education to replace a local school board

with a "board of control" where students in the district had a history of low test scores. Before

---

[13]The constitutional prohibition on special legislation was adopted in 1874 " for a very
simple and understandable purpose – to put an end to the flood of privileged legislation for
particular localities and for private purposes which was common in 1873." *Haverford Township
v. Siegle*, 346 Pa. 1, 6, 28 A. 786, 788 (1942) *quoted in Harrisburg School Dist. v. Hickok,* 762
A.2d 398, 405-06 (Pa. Commw. 2000).

the board of control was appointed, the school district was given an opportunity to develop an improvement plan. Only if the affected school district did not meet the goals established in the plan within three years would the board of control assume the powers of the school board. 24 P.S. § 17-1703-B, § 17-1705-B, § 17-1706-B. While this provision applied to second class school districts in general, the Harrisburg School District was treated differently. Where other school districts would have an opportunity to implement an improvement plan, a board of control would be immediately appointed not by the Secretary of Education, but by the mayor of Harrisburg, who at that time was Stephen Reed. In *Harrisburg School District v. Hickok*, 563 Pa. 391, 761 A.2d 1132 (2000), the Pennsylvania Supreme Court held that the classification of the Harrisburg School District in the so-called "Reed Amendment" to the Educational Empowerment Act violated Article III, Section 32 of the Pennsylvania Constitution. The court held that a classification consisting of "a school district of the second class with a history of low test performance which is coterminous with the city of the third class which contains the permanent seat of government" was simply another means to refer to the Harrisburg School District. Finding that there could never be but one member of the class (even in the unlikely event that the capital was moved to another city), the Supreme Court affirmed the holding by the Commonwealth Court that the Reed Amendment was per se unconstitutional as "special legislation." *Id.* at 397-98, 761 A.2d at 136.

Between the time the Commonwealth Court struck down Act 16 and the Supreme Court affirmed the decision, the General Assembly redrafted the Reed Amendment to address the constitutional infirmity identified by the Pennsylvania courts. In Act 91, Act of Nov. 22, 2000, P.L. 672, No. 91, the classification language of the Reed Amendment was replaced with a class

24

described as:

> a school district of the second class which has a history of extraordinarily low test performance, which is coterminous with a city of the third class that has opted under the "Optional Third Class City Charter Law" or 53 Pa. C.S. Pt. III Subpt. I to be governed by a mayor-council form of government and which has a population in excess of forty-five thousand . . . .

*Harrisburg School District v. Zogby*, 574 Pa. 121, 128, 828 A.2d 1079, 1083 (2003). The school district and individuals residing in the school district alleged that the classification, which included other school districts as a potential members of the class, was redrafted to avoid the special legislation prohibition and was not a rational classification. On preliminary objections, the Commonwealth Court found Act 91 suffered the same infirmities as Act 16, characterizing the law as prohibited special legislation. *Harrisburg School District v. Zogby*, 789 A.2d 797 (Pa. Commw. Ct. 2002) *rev'd Zogby*, 574 Pa. at 130, 828 A.2d at 1084.[14]  On appeal, the Supreme Court disagreed. It determined that because it was possible in the future for other school districts to be included in the same class, the class was not closed. Accordingly, the classification was determined to be constitutional. The Court also held that even if the General Assembly intended to target the City of Harrisburg, legislative motivation was irrelevant if the class as defined in the legislation was "reasonably related to the Commonwealth's legitimate interest in, and the General Assembly's constitutional duty to ensure, the existence of a 'thorough and efficient system of public education.'" *Zogby*, 574 Pa. at 141, 828 A.2d at 1091. (citations omitted).

not file bankruptcy until after June 11, 2012. The General Assembly may have passed Act 26

---

[14]Although it found Act 91 to be unconstitutional, the Commonwealth Court observed that "the merits of the legislative scheme or the motives behind its passage are irrelevant. The touchstone of legislation is not that it is laudable or even that it reflects the public will, but that it is also within the limits of our Constitution." *Id.* at 801.

with the purpose of barring the City of Harrisburg from seeking bankruptcy relief. The General Assembly's motivation, however, is irrelevant. The prohibition on filing bankruptcy would apply to any third class admitted to the Act 47 program. Among others, this prohibition currently applies to the City of Reading, which also is a third class city under Act 47. Therefore, based on the Supreme Court's holding in *Zogby*, Act 26 is not unconstitutional special legislation.

        D.     *Prospective application of Act 26*

As discussed above, City Council has argued that Act 26 is an impermissible retroactive application of law impairing vested rights. Council also has asserted that Act 26 should be interpreted prospectively to apply only to municipalities that enter the Act 47 program after the Act 26 effective date of June 30, 2011. As discussed above, City Council's argument that the law impairs vested rights is flawed. Likewise, its argument that Act 26 should only be applied to municipalities determined to be financially distressed *after* June 30, 2011 is similarly flawed.

The scope of the provision states that it "applies to a city of the third class which is determined to be financially distressed." City Council argues that because the phrase "*is determined*" is used, the bar to filing for bankruptcy only apples to a municipality that is determined to be financially distressed in the future, not to a municipality, like the City, which *has been* determined to be financially distressed.

When a court interprets a Pennsylvania statute, the goal is "to ascertain and effectuate the intention of the General Assembly." 1 Pa. C.S. § 1921(a); *see also Holland v. Marcy*, 584 Pa. 195, 206, 883 A.2d 449, 455 (2005) ("[O]ur goal is to ascertain the intent of the General Assembly in adopting the statute.") "When the words of a statute are clear and free from all

ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." 1 Pa. C.S. § 1921(b).

The clause "which is determined to be financially distressed" is an adjective clause modifying the phrase "third class city." "Which is determined to be financially distressed" describes what type of cities are subject to the Act. The General Assembly could have written the provision using the adjective phrase "determined to be financially distressed" without changing the meaning of the sentence. Employing this alternative structure, the sentence would read: "this section applies to a city of the third class determined to be financially distressed." The substitution of an adjective phrase for an adjective clause illustrates why City Council's construction of the statute is incorrect. Because the meaning of this alternative sentence is identical to the language of the statute, it is obvious that City Council's emphasis on the tense of the phrase "is determined" is irrelevant when construing the meaning of the sentence. The purpose of the clause is simply to clarify that the Act refers to financially distressed cities of the third class. Not only is this the proper grammatical interpretation of the clause, it is the most sensible one. Numerous municipalities are in the Act 47 program. It would be an absurd construction of the statute to find that the legislature intended for cities that have been determined to be financially distressed in the past are able to seek bankruptcy relief, but those that may enter the program in the future are barred from filing. It is even more difficult to accept this interpretation when the June 30, 2012 expiration date is considered. It is more reasonable to assume that the legislature was attempting to prevent several third class cities currently experiencing financial distress from seeking bankruptcy relief. Accordingly, Act 26 applies to the

27

City of Harrisburg, and to other cities that were determined to be distressed on or before June 30, 2011.

     E.     *Authority of City Council to file a petition on behalf of the City of Harrisburg*

Objectants have asserted that City Council was not authorized to file a petition on behalf of the City. While the Court will not attempt to address the numerous procedural objections raised by the parties, the Court does find that City Council was not authorized to commence a legal proceeding on behalf of the City under the Optional Third Class City Charter Law ("Charter Law"), Act 399 of 1957, P.L. 901, 53 P.S. § 41101 et seq.

Under the Charter Law, the City of Harrisburg has adopted the "Mayor-council Plan A" ("Plan A") form of government. Under Plan A, there is a clear separation of executive and legislative power. Legislative power is exercised by the council unless otherwise provided by law. 53 P.S. §41407. Executive power is exercised solely by the mayor. 53 P.S. § 41411; *see also Reed v. Harrisburg City Council*, 606 Pa. 117, 995 A.2d 1137 (2010). As the executive, the Mayor is authorized to appoint a solicitor with the advice and consent of Council. Harrisburg City Code § 2-303.1. The duties and responsibilities of the solicitor are set forth in "general law," which in this case refers to the Third Class City Code, Act of June 23, 1931, P.L. 932, 53 P.S. § 35101 et seq. Section 1602 of the Third Class City Code provides that the city solicitor has "the superintendence, direction, and control of the law matters of the city." 53 P.S. § 36602. Section 1603 of the Third Class City Code provides that, *inter alia*, the solicitor "shall commence and prosecute all and every suit or suits, action or actions, brought by the city . . . . 53 P.S. § 36603.

City Council retained an attorney and filed a petition with this Court on behalf of the City. Council defended its ability to file the petition without the concurrence or even the review

28

of the Mayor based upon Section 261(b) of the Act 47. This provision states that the authority to file a petition "may be exercised only upon the vote by a majority of the municipality's governing body." 53 P.S. § 11701.261(b). Act 47 defines "governing body" as a city's council. 53 P.S. § 11701.103. Under City Council's view, it alone was authorized to file the petition. Read in isolation, § 261(b) appears to support City Council's position. However, the Pennsylvania Supreme Court has advised courts that "[i]n interpreting statutes, our object is to ascertain and effectuate the intention of the General Assembly. 1 Pa. C.S. §§ 1903(a), 1921(b)." *Narberth Borough v. Lower Merion Tp.*, 590 Pa. 630, 643, 915 A.2d 626, 634 (2007). Statutes that relate to the same persons or things are *in pari materia*. 1 Pa. C. S. § 1932. Statutes or parts of statutes that are *in pari materia* are read as one statute. *Id.* Unless it is clear that the General Assembly intended later legislation to create "an exclusive, uniform or mandatory system of statutes, 'a later statute shall not be construed to supply or repeal an earlier statute unless the two statutes are irreconcilable.'" *Com. v. State Conf. of State Police Lodges of Frat. Order of Police*, 513 Pa. 285, 293, 520 A.2d 25, 30 (1987) (quoting 1 Pa. C.S. § 1971(c)).

Act 47 is intended to address the needs of financially distressed cities. It's provisions, however, are not intended to replace the entire scheme of governance set forth in the Charter Law and the Third Class City Code. Statutory provisions should be construed with reference to similar enactments and not simply read in a vacuum. *Pennsylvania Social Services Local 668 v. Pennsylvania Labor Relations Bd.*, 481 Pa. 81, 87, 392 A.2d 256, 258-59 (1978). When § 261(b) of Act 47 is read *in pari materia* with the Third Class City Code and the Charter Law, § 261(b) provides a limitation on the otherwise unfettered right of the Mayor to commence legal action on behalf of the City. Section 261(b) does not supplant other law allocating power

29

between the executive and legislative branches of municipal government, it simply clarifies that a mayor in a city operating under Plan A may not cause a petition to be filed unless a majority of the council also agrees that this is an appropriate course of action. Accordingly, City Council's usurpation of the executive power of the Mayor by commencing litigation of behalf of the City of Harrisburg violated the Charter Law and the Third Class City Code.

## IV. Conclusion

For the reasons set forth above, the Court determined that the within case should be dismissed because: (1) City Council did not have the authority under the Charter Law and the Third Class City Code to commence a bankruptcy case on behalf of the City of Harrisburg and (2) the City of Harrisburg was not specifically authorized under state law to be a debtor under Chapter 9 of the Bankruptcy Code as required by 11 U.S.C. § 109(c)(2).

**By the Court,**

*Mary D. France*

Chief Bankruptcy Judge

Date:  December 5, 2011